# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wayne DiFrancesco and : 
Mary Schlachter : 
 : 
 : 
v. : No. 730 C.D. 2015
 : 
 : 
Board of Supervisors of : 
the Township of London Grove : 
and Township of London Grove : 
and Cliff M. Anderson : 
 : 
 : 
Appeal of: Wayne DiFrancesco : 
 : 
 : 
Mary Schlachter, : 
　　　　　　　　　　Appellant : 
 : 
 : 
v. : No. 745 C.D. 2015
 : Argued: March 7, 2016
 : 
Board of Supervisors of London : 
Grove Township, : 
Cliff M. Anderson, and : 
Wayne DiFrancesco, : 
London Grove Township : 


BEFORE:　HONORABLE P. KEVIN BROBSON, Judge
　　　　　　HONORABLE JAMES GARDNER COLINS, Senior Judge
　　　　　　HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge


*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**　　　　　　　　**FILED: April 27, 2016**


　　　　　Wayne DiFrancesco and Mary Schlachter (collectively, Appellants) appeal from an order of the Court of Common Pleas of Chester County (trial court), which affirmed the decision of the Board of Supervisors of the Township of

London Grove (Board). The Board granted Cliff M. Anderson's (Anderson) application for a conditional use permit. We now reverse.

## I. BACKGROUND

Anderson is the owner of the property located at 645 North Guernsey Road, Chester County (Property), which is situated within the Agricultural Preservation District (AP District) of the Township of London Grove (Township). The Property was initially used as farmland. Anderson filed a conditional use application, in which he sought approval for the use of the Property as a dog training and dog show facility. Anderson proposed to conduct dog training classes during the week. On the weekends, Anderson sought to conduct multi-day dog shows or events. Anderson also sought approval for overnight RV accommodation for competitors during these events.

The Board conducted a series of hearings concerning the conditional use application. During the hearings, Anderson presented the testimony of James E. Fritsch, a civil engineer, Lawrence H. Ulmer, an engineer specializing in lighting, Thomas Kummer, a landscaper, Erich Carr Everbach, an engineer specializing in acoustics, and Andreas Heinrich, a professional traffic operations engineer. Mr. Everbach presented a report concerning compliance with the noise standards of the Township of London Grove Zoning Ordinance (Ordinance), Mr. Heinrich presented a traffic impact study, and Mr. Kummer prepared a landscaping plan. Anderson testified on his own behalf concerning the proposed use of the Property, and he offered a booklet of information[1] concerning the

---

[1] The booklet contained information relating to the various types of dog training that would be offered and the events that would take place during shows, including agility, rally **(Footnote continued on next page…)**

2

proposed use. In addition to testifying, Mr. Fritsch presented two conditional use plans,[2] a preliminary aquifer balance analysis report prepared by Lanchester Soil Consultants, Inc., and a letter from Eric Felker, Chief of the West Grove Fire Company. Schlachter, as an objector to the conditional use application,[3] presented the testimony of Denise Lacey, a dog training expert, and Susan Phillips, a civil engineer. Schlachter also testified on her own behalf in opposition to the conditional use application. During the hearings, counsel for the Township presented to the Board a list of proposed conditions agreeable to both the Township and Anderson.

After the hearings were completed, the Board issued a decision, approving Anderson's conditional use application subject to thirty-three conditions. In so doing, the Board summarized the testimony and exhibits presented at trial and concluded that the proposed use as a dog training and show facility was an authorized conditional use under the Ordinance. The Board also concluded that the application conformed to the area and bulk requirements of the Ordinance and complied, or would comply, with all of the standards for

---

**(continued…)**

obedience, treibball, disk dog, flyball, dock diving, and lure coursing. (Reproduced Record (R.R.) at 451a-56a.) The booklet further provided information concerning the proposed hours of operation, shows, amenities, and RV parking. (*Id.* at 457a-60a.)

[2] Initially, the facilities were planned to be constructed closer to the northern property line. In response to the concerns of the neighbors, the facilities were shifted closer to the southern property line and a new conditional use plan was presented to the Board demonstrating the shift.

[3] Schlachter and DiFrancesco were both recognized as parties to the matter during the course of the hearings. (R.R. at 111a-12a, 119a-20a.)

3

conditional use approval. Further, the Board concluded that the proposed use would not have a detrimental impact on the health, safety, and welfare of the community.

Appellants appealed the Board's decision to the trial court, which took no additional evidence. The trial court affirmed the Board's decision and dismissed Appellants' appeals. Appellants filed separate notices of appeal with this Court. After ordering Appellants to file a concise statement of errors complained of on appeal, the trial court issued an opinion pursuant to Pa. R.A.P. 1925(a). By order dated June 24, 2015, this Court, *sua sponte*, consolidated Appellants' appeals.

## II.   ANALYSIS

On appeal to this Court,[4] Appellants first argue that the Board erred in concluding that Anderson's proposed use of the Property was a permitted conditional use under the Ordinance. Appellants next contend that the Board erred in finding that Anderson sustained his burden to prove that his proposed use of the Property specifically complied with the Ordinance. Last, Appellants argue that the Board erred in finding that Appellants failed to sustain their burden to prove that Anderson's proposed use of the Property was detrimental to the health, safety, and welfare of the community.

---

[4] "[W]here the trial court takes no additional evidence, our standard of review is limited to determining whether the Board's findings are supported by substantial evidence and whether the Board has abused its discretion or committed an error of law." *Morris v. S. Coventry Twp. Bd. of Supervisors*, 898 A.2d 1213, 1217 n.3 (Pa. Cmwlth. 2006).

## A. Conditional Use

We first address Appellants' argument that the Board erred in concluding that Anderson's proposed use of the Property was a permitted conditional use under the Ordinance. Specifically, Appellants contend that the use of the Property for dog shows is not permitted as a conditional use under Section 27-302 of the Ordinance. Appellants also contend that even if dog shows are a permitted use of the Property, an RV "campground" is not a permitted use. Last, Schlachter argues that Anderson's proposed use is a "special event" under the Ordinance, and, therefore, must comply with the standards provided for special events.

### 1. Dog Show Facilities

Appellants contend that while animal training facilities are permitted conditional uses under the Ordinance, facilities for the purpose of conducting dog shows are not. Section 27-302.B(6) of the Ordinance, pertaining to permitted conditional uses in the AP District, permits "[r]iding academies, equestrian and animal shows and training facilities for animals, subject to the provisions of [Section] 27-303.9 [of the Ordinance]." Section 27-303.9 of the Ordinance, pertaining to the area and bulk regulations to be applied to permitted uses in the AP District, provides:

> 9. For riding academies, equestrian shows and training facilities for animals, permitted as a conditional use, the following standards shall apply:
>
> A. Lot size (minimum)—10 acres of net lot area.
>
> B. Perimeter setback (minimum)—75 feet.
>
> C. Building coverage (maximum)—20 percent.
>
> D. Impervious coverage (maximum)—40 percent.
>
> E. Perimeter fencing (minimum)—4-foot high safety fence. The burden shall be upon the

5

applicant to demonstrate that his proposed use does not require fencing.

Appellants argue that due to the omission of the term "animal shows" from Section 27-303.9 of the Ordinance, dog show facilities are expressly prohibited as a conditional use in the AP District. Appellants do not contend that the Ordinance is ambiguous, but, rather, that the Ordinance clearly precludes animal show facilities as a conditional use.

Whether a proposed use falls within a given category of permitted uses in a zoning ordinance is a question of law. *H.E. Rohrer, Inc. v. Zoning Hearing Bd. of Jackson Twp.*, 808 A.2d 1014, 1016 (Pa. Cmwlth. 2002). "Like statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance." *Bailey v. Zoning Bd. of Adjustment of City of Phila.*, 801 A.2d 492, 502 (Pa. 2002). "[A] statute's plain language generally provides the best indication of legislative intent." *Malt Beverage Distribs. Ass'n v. Pa. Liquor Control Bd.*, 918 A.2d 171, 175 (Pa. Cmwlth. 2007) (en banc), *aff'd*, 974 A.2d 1144 (Pa. 2009). "If we determine the statute is unambiguous, we must apply it directly as written." *Bowman v. Sunoco, Inc.*, 65 A.3d 901, 906 (Pa. 2013).

Here, the plain language of the Ordinance demonstrates the intent to allow dog show facilities as a conditional use in the AP District. Section 7-302.B(6) of the Ordinance expressly authorizes animal show facilities as a conditional use. In addition, the Ordinance subjects such facilities to the bulk and area requirements of Section 27-303.9 of the Ordinance. The omission of the term "animal shows" from the language of Section 27-303.9 of the Ordinance does not signify the intent to preclude animal show facilities as a conditional use, as such facilities are expressly permitted in the portion of the Ordinance pertaining

6

directly to permitted uses. Section 27-303.9 of the Ordinance simply relates to the bulk and area requirements that certain uses must comply with in order to obtain conditional use approval. As provided in Section 27-302.B(6) of the Ordinance, animal shows are one such use. Accordingly, we reject Appellants' contention that animal shows are not a permitted conditional use under the Ordinance.

## 2. RV Parking

Appellants next contend that RV "campgrounds" are a recreational use that is not permitted by right, conditional use, special exception, or accessory use within the AP District. Specifically, Appellants argue that overnight RV parking is a dominant use of the Property that is unrelated to the permitted conditional use of the Property as a dog training facility. Overnight RV parking on the Property, Appellants contend, is not customary and incidental to the permitted conditional use of the Property. Anderson and the Board counter that overnight RV parking is a permitted accessory use that is customarily associated with dog show facilities.

There is no dispute that overnight RV parking is not a use permitted by right, conditional use, or special exception. The question, therefore, is whether RV parking is permitted as an accessory use in the AP District. Section 27-302.D(3) of the Ordinance, pertaining to permitted accessory uses in the AP District, allows "[n]onresidential accessory uses to permitted uses," excepting only accessory uses to veterinary hospitals. The Ordinance defines the term "accessory use" as follows:

> *Use, accessory*—an accessory use is a use or activity conducted on the same lot as a principal use having all of the following definitional attributes: (1) it is clearly subordinate to the principal use; (2) it is customarily associated therewith; and (3) it complies with all special

7

and general requirements set forth herein applicable generally or by special application to that accessory use.

Section 27-202 of the Ordinance. A principal use is defined as "the dominant or main use on a lot." *Id.* "[A]n accessory use may exist even where there is no evidence that a majority, or even a substantial number, of similar properties are engaged in a similar accessory use." *Southco, Inc. v. Concord Twp.*, 713 A.2d 607, 611 (Pa. 1998).

Here, there was ample evidence to support the allowance of overnight RV parking as an accessory use.[5] As noted above, Anderson was required to prove that overnight RV parking is subordinate to the principal use of the Property and that it is customarily associated with the principal use of the Property. As to the subordination of overnight RV parking to the principal use, Anderson testified that the Property would be used for dog training Monday through Friday, from 8:00 a.m. to 10:00 p.m. (R.R. at 43a.) Dog shows would typically take place during the weekend, beginning on Saturday and ending on Sunday afternoon, but they would not take place every weekend. (*Id.* at 43a, 457a.) Overnight RV parking would be available for participants of the shows or judges and trainers associated with the shows. (*Id.* at 406a.) Anderson testified that the purpose of the RV parking area is to facilitate travel and overnight accommodation for participants. (*Id.* at 44a.) Specifically, many competitors travel for several hours and bring multiple dogs to show, and RVs provide an easier means of transportation and overnight accommodation. (*Id.* at 44a, 139a.) Under Anderson's proposed plan, RVs could arrive the night before the event and could stay for up to twelve hours after the

---

[5] In its list of conditions, the Board explained that "the RV area may only be used as an accessory use of the dog training and dog show facility." (Bd. Decision at 24.)

8

conclusion of the event. (*Id.* at 46a.) This evidence is sufficient to show that the overnight RV parking area is subordinate to the principal use of the Property—namely, the use as a weekend animal show facility. The overnight RV parking area would only be available during events to accommodate some participants. Such a use is not dominant but, rather, subordinate to the permitted conditional use as an animal show facility.

There is also sufficient evidence to demonstrate that overnight RV parking is customarily associated with dog show facilities. In discussing the competitors who participate in comparable events, Anderson explained that the "people that go to these events, it's [the] same guys and gals in RVs every weekend." (*Id.* at 60a.) Lisa Trevisan commented that she is a competitor who attends similar events in her RV. (*Id.* at 107a.) Schlachter's expert, Denise Lacey, testified as to other facilities with overnight RV parking, including the York County Fairgrounds and the Romano 4H Center. (*Id.* at 126a, 138a.) Ms. Lacey explained that some dog show facilities that allow overnight RV parking have electrical hook-ups available for RVs. (*Id.* at 132a.) Like Anderson, Ms. Lacey testified that RVs provide an easier means of overnight accommodation and transportation for certain competitors. (*Id.* at 139a.) Although Ms. Lacey denied that it was customary for people to bring RVs to these events, she explained that "there will be a small number of people that will bring an RV if it's permitted." (*Id.* at 143a.) Such evidence is sufficient to establish that overnight RV parking is customarily associated with facilities that host dog shows. Anderson only needed to demonstrate that such a use was customary, not that a large portion of competitors bring RVs or that all similar facilities provide for overnight RV parking. Because there was sufficient evidence to demonstrate that overnight RV

9

parking was subordinate to and customarily associated with the principal use of the property, we reject Appellants' argument that overnight RV parking is not a permitted accessory use in the AP District.[6]

_____

[6] Underlying much of Appellants' argument concerning dog show facilities and RV parking is the premise that Anderson intends to run a large-scale commercial facility. Appellants contend that the commercial nature of such a facility does not fulfill the stated purposes of the AP District—namely, the preservation of farmland and "compatible farm service uses" of the land. *See* Section 27-301 of the Ordinance. We note, however, that "the letter of the ordinance is not to be disregarded under the pretext of pursuing its spirit." *Borough of Fleetwood v. Zoning Hearing Bd. of Borough of Fleetwood*, 649 A.2d 651, 656 (Pa. 1994). Not only are dog show facilities and overnight RV parking permitted under the Ordinance, the Ordinance does not distinguish between commercial and non-commercial uses within the AP District. In fact, the Ordinance expressly permits a number of clear commercial uses within the AP District, such as veterinary hospitals, wineries, livestock auction facilities, and golf or country clubs. *See* Sections 27-301.A-.C of the Ordinance. Accordingly, we reject Appellants' contention that the commercial nature of the proposed use conflicts with the purpose of the AP District.

Similarly, Appellants expressed concern as to the "intensity" of the proposed use during oral argument. Specifically, Appellants take issue with the large number of competitors, spectators, and vendors that will potentially visit the Property during shows. The intensity of the proposed use, however, does not affect the authorization of the facility as a conditional use where such a use is expressly permitted by the Ordinance. *See* Section 27-302.B(6) of the Ordinance. Although we understand Appellants' concerns as to the amount of people potentially present during shows, such concerns are, in this instance, only relevant to the Board's consideration of the application's compliance with the Ordinance and the effect of the proposed use on the health, safety, and welfare of the community. *See, e.g.*, Section 27-2208.A(3) of the Ordinance (requiring Board of Supervisors or Township Zoning Hearing Board to apply specific performance standards to "regulate the nature, intensity, density, design, layout, and operation of the proposed land use" in considering special exception or conditional use applications). Further, the Board may also impose reasonable conditions to alleviate some or all of these concerns, as it did in the instant matter. *See* Section 913.2(a) of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, added by the Act of December 21, 1988, P.L. 1329, *as amended*, 53 P.S. § 10913.2(a). Accordingly, we reject Appellants' argument as to the intensity of the proposed use.

### 3. *Special Event*

Schlachter contends that Anderson's proposed use is a special event under the Ordinance and, therefore, must comply with the standards provided for special events. Special events are a permitted conditional use under Section 27-302.B(4) of the Ordinance, but they must comply with certain requirements prior to approval as a conditional use pursuant to Section 27-303.7 of the Ordinance. Special events are defined as follows:

> *Special event*—a special event shall constitute an activity lasting more than 12 hours and open to the general public or a specialized segment thereof wherein admission thereto is by advertisement or invitation (whether or not a fee is charged therefor). No lot shall be used for special events more than four times in any calendar year. Special events include, but are not limited to, the sale of items or services such as carnivals, the conduct of flea markets, the providing of lawful games of chance and activities constituting competition with awards of prizes. *Excluded from the definition of "special event" are* private parties by invitation at which no admission charge is made, liquidation sales or *events at institutions having permanent facilities designed for such events, such as stadia, auditoriums, etc.*

Section 27-202 of the Ordinance (emphasis added).

Here, Anderson need not comply with the requirements for special events, because his proposed use of the Property is not, by definition, a special event. Rather, the proposed use is expressly excluded from the definition of special event due to the planned permanent facility designed for dog training and dog shows. Despite Schlachter's contentions that there is no authority for building such a facility, the Ordinance specifically allows for the construction of dog training and dog show facilities as a conditional use in the AP District. We, therefore, reject Schlachter's argument that Anderson's proposed use is a special

11

event under the Ordinance and, therefore, must comply with the standards provided for special events.

## B. Compliance With Ordinance

Appellants next contend that the Board erred in finding that Anderson sustained his burden to prove that his proposed use of the Property complied with the requirements of the Ordinance relating to conditional use approval. Specifically, Schlachter argues that the proposed use does not comply with the requirements for uses situated within the Groundwater Protection District and that the proposed use does not comply with the parking, buffering, noise, dust, vibration, and fire protection requirements of the Ordinance.[7]   DiFrancesco

---

[7] Within this argument, Schlachter also appears to argue that Anderson failed to demonstrate compliance with the requirements pertaining to special events.  As noted above, however, Anderson's proposed use is not a special event within the meaning of this section of the Ordinance.  Accordingly, Anderson need not comply with these requirements.

Schlachter also appears to take issue with the conditions offered by the Township during the hearings before the Board, as well as the Board's "disregard" of a letter from the Township Engineer, which indicated that the application did not comply with various sections of the Ordinance.  As to the conditions offered during the hearings, Schlachter contends that these conditions were offered by the Township Zoning Officer, who should have rejected Anderson's plan instead of suggesting conditions for approval.  We note, however, that the Township Zoning Officer has no authority to approve or reject conditional use applications.  Sections 27-2302, -2310 of the Ordinance.  Further, the Township Zoning Hearing Board, rather than the Board of Supervisors, has jurisdiction over "[a]ppeals where it is alleged by the appellant that the Zoning Officer has failed to follow prescribed procedures or has misinterpreted or misapplied any provision of a valid ordinance . . . or any valid rule or regulation governing the action of the Zoning Officer."  Section 27-2206.1(J) of the Ordinance.  Accordingly, we reject Schlachter's argument as to the actions of the Township Zoning Officer.  As to Schlachter's argument that the Board improperly disregarded the letter from the Township Engineer, we note that the Board, in considering conditional use applications, is not required to base its decision entirely on the Township Engineer's opinion.  Section 27-2310 of the Ordinance.  Rather, "[i]t is the function of [the B]oard to weigh the evidence before it."  *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 811 (Pa. Cmwlth.), *appeal denied*, 887 A.2d 1243 (Pa. 2005).  The Board, thus, had **(Footnote continued on next page…)**

contends that the proposed use does not comply with the area and bulk, sewer, and traffic requirements of the Ordinance. "In order to demonstrate that the applicant is entitled to the conditional use, the applicant initially bears the burden of establishing that the application complies with the objective standards and criteria of the particular ordinance." *In re Richboro CD Partners, L.P.*, 89 A.3d 742, 745 (Pa. Cmwlth.), *appeal denied*, 97 A.3d 746 (Pa. 2014). If the applicant is able to satisfy this burden, "the application must be granted, unless the protestors to such an application have presented sufficient evidence that such a use would pose a substantial threat to the community." *Visionquest Nat'l, Ltd. v. Bd. of Supervisors of Honey Brook Twp., Chester Cnty.*, 569 A.2d 915, 917 (Pa. 1990). The Ordinance provides the following as to the parties' burdens:

> In all applications for conditional uses, the burden of persuasion shall as to all aspects and standards, shall be and remain upon the applicant. Further, the initial burden of going forward with the evidence shall be upon the applicant to demonstrate (1) compliance with each and every applicable term, condition and provision of this Chapter; and (2) compliance with all performance standards which by the terms of this Chapter are made relevant to the proposed conditional use as set forth in Part 18. With regard to proof of general requirements that the application, if granted, would not be contrary to the public health, safety, and welfare, the initial burden as to specific objections shall be upon the protestant or township, but the burden of persuasion with respect to specific objections raised shall be and remain upon the application.

_____

**(continued…)**

the authority to reject the Township Engineer's opinion as to various violations of the Ordinance in favor of the evidence presented that demonstrated compliance with the Ordinance. We, therefore, reject Schlachter's argument as to the Township Engineer's letter.

Section 27-2310.E of the Ordinance.

Section 27-2310 of the Ordinance provides the procedures the Board must follow and the standards with which an applicant must comply in order to obtain conditional use approval. Section 27-2310.C of the Ordinance provides:

> C. Standards for review of proposed conditional use shall be as follows:
>
> (1) The proposed use shall meet all of the specific standards and regulations for eligibility which appear in the Section of this Chapter authorizing the proposed conditional use.
>
> (2) The standards set forth in §[]27-2208 for review of special exception applications, shall be met.

Section 27-2208.A(3) of the Ordinance, pertaining to the review of special exception applications, provides that the Board must "[a]ssure that the specific standards set forth in §§[]27-1814 through 27-1825 shall be made applicable to regulate the nature, intensity, density, design, layout, and operation of the proposed land use permitted as a special exception." The Board may, however, waive these standards "if the generic type of use poses no potential for significant impact upon such standards." Section 27-2208.A(3) of the Ordinance. In reviewing a conditional use application, the Board must also ensure that the application complies with a number of general standards. The general standards relevant to the instant matter are as follows:

> (1) For all uses, off-street parking regulations and design standards shall be as provided in Part 20 hereof.
>
> . . . .
>
> (3) The applicant shall establish by a fair preponderance of credible evidence that the use intended at the location intended shall not be contrary to the public health, public safety, or public welfare.
>
> . . . .

14

(8) All applicable standards of Part 18.

Sections 27-2310.D(1), (8) of the Ordinance. Part 18 provides a number of general design and performance standards with which an applicant must comply prior to conditional use approval.

### 1. Ground Water Protection District

Schlachter first argues that Anderson's proposed use impermissibly encroaches into the Ground Water Protection District. Specifically, a large portion of the proposed overflow parking for the facility as well as a few permanent parking spaces are located within the Ground Water Protection District. Section 27-1407.1 of the Ordinance provides the following as to uses permitted in the Ground Water Protection District: "Only uses permitted 'as of right' or 'by right' in the underlying zoning district. Uses that are permitted by conditional use or special exception in the underlying zoning district are not permitted in the Ground Water Protection District." Schlachter argues that because the application concerns the conditional use of the Property, the Ordinance expressly precludes the proposed use from occupying any part of the land within the Ground Water Protection District.

Relying on the language of Section 27-1406.1,[8] Anderson and the Board contend that grass parking spaces such as those proposed for the overflow parking lot are not structures that are prohibited from being located in the Ground Water Protection District. This argument ignores the language of

---

[8] Section 27-1406.1 of the Ordinance provides: "No structure, land, or water shall be used or developed, and no structure shall be located, extended, converted, or structurally altered in the Groundwater Protection District unless the applicant can minimize the adverse impacts of the proposed action."

Section 27-1407.1 of the Ordinance, which clearly precludes any *uses* other than those permitted as of right or by right. A "use" is defined in the Ordinance as "an activity or the specific purpose for which land or a building is designed, arranged, intended or improved or for which it is or may be occupied or used." Section 27-202 of the Ordinance. An overflow parking lot, although not a structure, fits within the definition of "use" as it constitutes a specific purpose for which the land at issue is intended. At most, a parking lot is an accessory use or a required aspect of the proposed conditional use.[9] Although the Ordinance does not specifically mention accessory uses, it does limit uses in the Ground Water Protection District to "*[o]nly* uses permitted 'as of right' or 'by right' in the underlying zoning district." Section 27-1407.1 of the Ordinance (emphasis added). A parking lot is not a use permitted as of right or by right in the AP District.[10] We, therefore, conclude that Anderson's proposed use impermissibly encroaches upon the Ground Water Protection District.

---

[9] Certain conditional uses, including the proposed use that is the subject of the instant matter, are required to comply with the parking regulations of Chapter 20 of the Ordinance. In this case, the proposed use must have one parking space for every 500 square feet of floor area, as well as a parking space for each employee. Section 27-2009.2(E).

[10] Anderson and the Board further contend that the plan provides for more parking spaces than are required by the Ordinance for this particular use. Even if this statement is true, it does not excuse the placement of a parking lot within the Ground Water Protection District, as the Ordinance expressly prohibits such a use. Although the proposed use provides ample parking, it is still in violation of the Ordinance as to the placement of the overflow parking lot.

Anderson and the Board also argue that Mr. Fritsch was informed by the "Township" that such facilities could be located within the Ground Water Protection District. (R.R. at 286a.) The Township, however, does not have the jurisdiction to determine what may or may not be built in the Ground Water Protection District. This jurisdiction lies with the Board, or, alternatively, the Township Zoning Hearing Board. *See* Sections 27-2206, -2310 of the Ordinance.

## 2. *Parking*

Schlachter next contends that Anderson's proposed use does not comply with the parking requirements of the Ordinance. Specifically, Schlachter argues that Anderson intends to use a gravel parking surface in violation of the Ordinance, which purportedly requires an all-weather surface for parking areas. Schlachter also takes issue with the Board's condition that Anderson must obtain zoning relief to use a gravel surface and argues that the Board may not impose a condition in order to remedy a defect in the conditional use application.

During the hearings before the Board, Anderson expressed interest in using asphalt for a portion of the access drive and stone or gravel for the parking area. (R.R. at 25a.) Although Schlachter appears to argue that a stone or gravel surface is not an all-weather surface[11] and, therefore, does not comply with the Ordinance, Schlachter does not identify the section of the Ordinance which requires such a surface. (*See* Schlachter Br. at 39.) This Court has held that the failure to cite relevant authority results in waiver. *See, e.g.*, *D.Z. v. Bethlehem Area Sch. Dist.*, 2 A.3d 742, 750 n.8 (Pa. Cmwlth. 2010), *appeal denied*, 29 A.3d 798 (Pa. 2011); *Am. Rock Mechs., Inc. v. Workers' Comp. Appeal Bd. (Bik and Lehigh Concrete Techs.)*, 881 A.2d 54, 56 (Pa. Cmwlth.), *appeal denied*, 891 A.2d 734 (Pa. 2005). Accordingly, Schlachter's argument that Anderson's proposed use does not comply with the parking requirements of the Ordinance is waived for failure to cite to relevant authority.

---

[11] The Ordinance defines an all-weather surface as "porous pavers or a pavement constructed of graded stone or slag, with or without a surface of penetration macadam, bituminous concrete or Portland cement concrete." Section 27-202 of the Ordinance.

As to Schlachter's contention that the imposition of a condition cannot "fix" a defective application and that an applicant's intent or promise to comply with an ordinance is not enough to justify approval of an application, we note that the Supreme Court of Pennsylvania has held:

> [W]here the plan, as submitted, addresses all of the ordinance's prerequisites for the special exception sought, and reasonably shows that the property owner is able to fulfill them in accordance with the procedures set forth by the zoning code (as reasonably interpreted by the board), a reviewing court should not reverse the grant of such an exception on the sole basis that some of the items described in the plan may be completed at a later date.

*Broussard v. Zoning Bd. of Adjustment of City of Pittsburgh*, 907 A.2d 494, 502 (Pa. 2006). Here, the Board reasonably interpreted the Ordinance as allowing Anderson to seek zoning relief in order to utilize a stone or gravel parking surface. The condition imposed by the Board, rather than remedying a clear defect in the application, simply served as a notice that the use of stone or gravel would require approval from the Township Zoning Hearing Board. Put differently, the Board's condition is not a remedy, but a truism—namely, that if Anderson obtains permission to use a stone or gravel parking surface, he may use a stone or gravel parking surface. Accordingly, we reject Schlachter's argument as to the Board's condition.

### *3. Buffering*

Schlachter next contends that Anderson's proposed use does not comply with the buffering standards provided in Section 27-1806 of the Ordinance. Specifically, Schlachter argues that although appropriate buffering may have been provided along the northern property line, no buffering was provided on the eastern property line, which abuts North Gurnsey Road. Section 27-1806.1 of the

Ordinance provides that an application must comply with the buffering standards "where proposed commercial, industrial, office or intensive agricultural uses are to be located adjacent to existing residential zoning districts." The buffering standards are deemed to be met "if the items to be buffered . . . are located greater than 400 feet from the adjacent residential uses." Section 27-1806.2 of the Ordinance. Buffering may consist of appropriate landscaping, man-made barriers, or grading. Sections 27-1806.5(A)-(C) of the Ordinance. Schlachter argues that there are residences within 400 feet of the proposed facility, and, therefore, Anderson was required to demonstrate compliant buffering along the eastern property line in addition to the northern property line. Further, Schlachter argues that the Board's condition requiring Anderson to provide buffering along the eastern property line was in error as the Board may not impose a condition in order to remedy a defect in the conditional use application.

There is no evidence in the record that demonstrates that the area across from the Property and abutting North Gurnsey Road is a "residential zoning district" such that buffering would be required. Assuming, however, that the area does constitute a residential zoning district for purposes of the Ordinance, the Board did not err in imposing a condition that would require buffering along the eastern property line. During the hearing before the Board, Anderson presented a plan to use landscaping as buffering. Section 27-1806.6 of the Ordinance provides that "[a] landscaping plan utilizing appropriate native species is encouraged and preferred. *Such plan incorporating the above measures shall be prepared by the applicant and approved by the Township as part of the development plan.*" (Emphasis added.) Thus, although Anderson's plan does not, at present, provide buffering along the eastern property line, Anderson is not required to present a

19

fully-realized landscaping design plan until the land development process commences. The Board's condition requiring buffering along the eastern property line, therefore, is not remedying a defect in Anderson's conditional use application. Rather, the condition simply identifies the standards with which Anderson must comply during the land development process. Accordingly, we reject Schlachter's argument that Anderson's proposed use does not comply with the buffering standards provided in Section 27-1806 of the Ordinance.

### *4. Noise*

Schlachter next argues that the conditional use application failed to demonstrate compliance with the Township's regulations concerning disturbance of the peace and dog barking. *See* Sections 2-102, -201 of the Code of Ordinances of the Township of London Grove. Schlachter notes that Anderson's acoustics expert, Mr. Everbach, testified that a barking dog halfway to the border of Schlachter's property would violate the noise ordinance. Despite Schlachter's contentions, however, Anderson did not need to demonstrate compliance with these regulations in order to obtain conditional use approval, as they are not a consideration during the conditional use process. *See* Section 27-2310 of the Ordinance. To the extent that Schlachter expressed concerns with the potential noise ordinance violations, these concerns were more appropriately addressed as part of the Board's analysis concerning the proposed use's effect on the health, safety, and welfare of the community.[12] Accordingly, we reject Schlachter's

---

[12] As to future violations of these regulations, we note that "the possibility of a future violation of zoning or other regulations, without more, cannot be a basis for denial of a zoning approval." *Appeal of Klock*, 415 A.2d 705, 707 (Pa. Cmwlth. 1980).

argument that the conditional use application failed to demonstrate compliance with the Township's regulations concerning disturbance of the peace and dog barking.

In her argument concerning the effect of the facility on the health, safety, and welfare of the community, Schlachter contends that Anderson did not demonstrate compliance with the specific performance standard relating to noise, Section 27-1818 of the Ordinance. Unlike the regulations discussed above, Anderson was required to demonstrate compliance with this section in order to obtain conditional use approval pursuant to Section 27-2310 of the Ordinance. Section 27-1818 of the Ordinance provides:

> The sound level of any operation, excluding off-site transportation facilities, temporary construction and demolition activities and emergency alarm signals, shall not exceed the following decibel level in the designated octave bands. All sound pressure levels shall be measured at the property lines of the receiving land use. For any source of sound which emits an impulsive sound (a sound of short duration, with an abrupt onset and rapid decay and an occurrence of not more than one time in any 15 second interval) the excursions of sound pressure level shall not exceed 20 dBA over the ambient sound level, regardless of time of day or night or receiving land use.

As noted above, Anderson presented the testimony and expert report of Mr. Everbach to demonstrate the proposed use's compliance with the specific performance standard relating to noise.

Schlachter contends that Mr. Everbach did not consider noise from the eastern or western property lines, did not measure ambient sound, did not consider impulsive sound, and did not consider the effect of atmospheric conditions. We disagree that Mr. Everbach's testimony does not constitute substantial evidence to

21

demonstrate compliance with the specific performance standard concerning noise.[13] Although Mr. Everbach did not testify specifically as to the eastern or western property lines, he did provide a means of calculating the noise by distance: "[W]e would expect spherical spreading to reduce these values by 6 dB for each doubling of distance from the source to the property line." (R.R. at 772a.) In his report, he explained that his report was based on a "worst case scenario," and he assumed the absence of any structure to mitigate sound. (*Id.* at 771a.) The presence of any structure would decrease the noise by *at least* 20 decibels. (*Id.* at 315a.) He did not believe that measurements of ambient and impulsive sounds were relevant to the overall sound level. (*Id.* at 311a-12a.) Similarly, he testified that it was extremely unlikely that an atmospheric study would affect the noise level. (*Id.* at 317a.) Ultimately, Mr. Everbach opined that the proposed use of the property would, within a reasonable degree of engineering certainty, comply with the noise requirements. (*Id.* at 299a.) Substantial evidence thus demonstrates compliance with Section 27-1818 of the Ordinance.

### 5. Dust

Schlachter next argues that Anderson's conditional use application does not comply with the specific performance standard concerning dust set forth in Section 27-1819 of the Ordinance, because there is a possibility that Cockeysville marble would need to be blasted during construction. Section 27-1819.2 of the Ordinance provides that "[n]o dust or particulate matter

---

[13] Substantial evidence is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Zoning Hearing Bd. of Sadsbury Twp. v. Bd. of Supervisors of Sadsbury Twp.*, 804 A.2d 1274, 1278 (Pa. Cmwlth. 2002).

22

shall be emitted from any chimney, quarry, factory or other operation having a visible gray opacity greater than No. 1 on the Ringleman Smoke Chart." Further, "[t]he emission of dirt, dust, or fly ash, in sufficient quantities which may cause any damage to human health, to animals, to vegetation or to property, or which can cause soiling or staining of persons or property at any point beyond the lot lines *of the use creating the emission* is prohibited." Section 27-1819.2 of the Ordinance (emphasis added). The language of the Ordinance thus indicates that this specific performance standard relates to the emission of dirt and dust from the proposed use of the property, rather than the construction of that use. Here, Mr. Fritsch testified that the "project is not proposing to emit any dust or particulate matter from chimney, quarry or factory." (R.R. at 275a.) Mr. Fritsch was aware of the potential need to blast during construction. (*Id.* at 61a.) Such testimony was sufficient to establish that the proposed use—namely, the dog training and show facility—would not cause the emission of dust and dirt in the manner contemplated by this section of the Ordinance. Accordingly, we reject Schlachter's argument that Anderson's conditional use application does not comply with the specific performance standard concerning dust.

### 6. *Vibrations*

Schlachter next argues that Anderson's conditional use application does not comply with the specific performance standard concerning vibrations set forth in Section 27-1823 of the Ordinance. As in her argument concerning the specific performance standard for dust, Schlachter contends that because there could be blasting of Cockeysville marble, Anderson could not demonstrate that vibrations would not result. Section 27-1823.2 of the Ordinance, however, provides that "*[e]xcept for vibrations produced as a result of construction*

23

*activities upon the premises*, no use shall cause earth vibrations or concussions detectable beyond its lot lines without the aid of instruments." (Emphasis added.) Thus, even if the hypothetical blasting of Cockeysville marble created such vibrations, the Ordinance expressly excludes such activity as it is part of the construction process. There is no indication that Anderson intends to engage in blasting activity beyond that which is required to construct the facility, and Mr. Fritsch testified that Anderson was not "proposing to cause any earth vibrations or concussions detectable beyond its lots lines." (R.R. at 276a.) We, therefore, reject Schlachter's argument that Anderson's conditional use application does not comply with the specific performance standard concerning vibrations.[14]

## 7. Fire Protection

Schlachter next contends that Anderson's conditional use application does not comply with the specific performance standard concerning fire protection set forth in Section 27-1817 of the Ordinance. Schlachter takes issue with the letter from Chief Felker of the West Grove Fire Company and contends that the

---

[14] Within her arguments concerning the specific performance standards for dust and vibrations, Schlachter also appears to argue that the Board erred in relying on Mr. Fritsch's testimony. Specifically, Schlachter contends that "Mr. Fritsch lacked authority to issue an opinion that the facility is not detrimental to the health, safety, and welfare of the community." (Schlachter Br. at 45.) Despite Schlachter's contentions, however, there is no indication that the Board relied on Mr. Fritsch's testimony in this regard. Rather, in concluding that the proposed use would not adversely impact the health, safety, and welfare of the community, the Board explained that the application complied with the Ordinance, Appellants had the burden to prove harm to the health, safety, and welfare of the community, and that Appellants did not satisfy their burden: "[Appellants] have not presented evidence with respect to specific issues and have not established that the proposed use wi[ll] adversely affect the health, safety and welfare of the community in a substantial and abnormal manner. Therefore, . . . [Appellants] have not met their burden." (Bd. Decision at 23.) Accordingly, we reject Schlachter's argument.

24

letter was presented without foundation, constituted hearsay, and did not establish compliance with the Ordinance.[15]

> Section 27-1817.2 of the Ordinance provides:
>
> All activities and all storage of flammable and explosive material at any point shall be provided with adequate safety devices against the hazard of fire and explosion, and adequate firefighting and fire-suppression equipment, and devices as detailed and specified by the laws of the Commonwealth of Pennsylvania. The applicant shall furnish a plan of fire protection approved by the chief of the fire department having first call jurisdiction demonstrating that firefighting facilities are available to fight fires or similar casualties any place within the subject premises to the extent that the peril may there be found.

In the letter presented to the Board to demonstrate Anderson's compliance with the fire protection standard of the Ordinance, Chief Felker stated that "[t]he West Grove Fire Company has the ability and resources, with our partnered mutual aid fire and EMS departments, to handle emergency situations at the above referenced property; in accordance with London Grove Ordinance 27, §[]27-1817 Specific Performance—Fire Protection." (R.R. at 765a.)

---

[15] For purposes of our analysis, we assume that the letter was admissible. Anderson and the Board correctly note that in hearings before the Board, "[f]ormal rules of evidence shall not apply, but irrelevant, immaterial, or unduly repetitious evidence may be excluded." Section 908(6) of the MPC, 53 P.S. § 10908(6). This Court has held that the Board is not bound by the rule against hearsay. *See Town & Country Mgmt. Corp. v. Zoning Hearing Bd. of the Borough of Emmaus*, 671 A.2d 790, 792 (Pa. Cmwlth. 1996). *But see Lake Adventure Cmty. Ass'n, Inc. v. Dingman Twp. Zoning Hearing Bd.*, 79 A.3d 708, 714 n.4 (Pa. Cmwlth. 2013) (explaining that hearsay evidence must be sufficiently corroborated to be considered competent), *appeal denied*, 84 A.3d 1065 (Pa. 2014). Further, in requiring a plan of fire protection approved by the fire chief, the Ordinance essentially calls for the Board to consider hearsay evidence in conditional use proceedings.

Schlachter does not identify the portion of the fire protection standard with which Anderson has not demonstrated compliance. We agree with Anderson and the Board that the letter constitutes substantial evidence to demonstrate compliance with the portion of the standard that requires a plan of fire protection approved by the fire chief. The first sentence of the standard concerning safety devices and fire-suppression equipment is, however, ambiguous. On one hand, the standard may be interpreted as requiring all uses to provide adequate fire safety equipment. On the other, the fire safety equipment requirement may be interpreted so as to apply only to activities involving flammable and explosive material or the storage of such material. Because we reverse on other grounds, we need not address this ambiguity. Should the application be resubmitted in the future, however, the Board may wish to clarify its interpretation of Section 27-1817.2 of the Ordinance.

### 8. Sewer

DiFrancesco argues that the conditional use application does not demonstrate compliance with the sewage disposal standards of the Ordinance set forth in Section 27-1809 of the Ordinance, because Anderson never identified a proposed system of sewage treatment. Rather, Anderson only demonstrated that such a system could be built. We agree that substantial evidence does not exist to demonstrate compliance with Section 27-1809 of the Ordinance.

Section 27-1809.1 of the Ordinance provides:

The applicant shall demonstrate the ability to provide safe, efficient and permanent facilities for the collection, treatment and disposal of sanitary sewage generated within the tract and shall further demonstrate that the proposed system is capable of so functioning without degradation of streams, or pollution to, or diversion of the underground water table.

26

Section 27-2310.A of the Ordinance, pertaining to conditional use applications, provides that "[f]easibility of water supply, sanitary sewage disposal, and storm drainage control should be demonstrated but need not be fully engineered." During the hearing before the Board, Anderson presented a preliminary aquifer balance analysis prepared by Lanchester Soil Consultants, Inc., to address the Ordinance's requirements concerning water consumption. The report provided that a proposed well and an on-lot sewage disposal system "which will dispose of wastewater by re-introducing the water back into the soil" would not decrease the available water in the aquifer. (R.R. at 762a.) In discussing the sewage disposal system, Mr. Fritsch testified:

> Q. Where on the property will sanitary sewer effluent be handled?
>
> A. Sanitary sewer will be – effluent will be handled along North Guernsey Road. . . .
>
> Q. Okay. What type of facilities are contemplated?
>
> A. That – I'm not sure if Lanchester Soils has done their final design on the exact method.
>
> . . . .
>
> Q. So what we have right now is a thought or contemplation that we will be able to comply with sanitary sewer requirements?
>
> A. Based on his testing, yes.

(*Id.* at 281a.) Further, in responding to a question about the location of the sewage disposal system Mr. Fritsch replied:

> I'm not involved in designing the septic system. Lanchester Soils will be designing it, Russ Losco . . . . He has done testing along there, front of the property or east side of the property along North Guernsey Road. I do not believe he's designed the system yet. So the system will be designed. It will need to be permitted by Chester County Health Department.

27

(*Id.* at 74a.) The record contains additional references to a septic system. (*Id.* at 17a, 189a-90a, 221a, 259a, 344a.) What the record does not contain, however, is any reference to the proposed type of septic system, for example—whether it is a sand mound, sand filter, or pressure distribution system. Further, although the report of Lanchester Soil Consultants references an on-lot sewage disposal system that will recharge groundwater by reintroducing wastewater back into the soil, there was no indication that the reintroduction of wastewater would not cause the degradation of streams or pollution to the underground water table. No facilities are provided for in the plan, although a number of locations tested by Lanchester Soil Consultants were indicated as potential sites for the facilities.

In arguing that the evidence presented to the Board is sufficient to demonstrate compliance with the Ordinance, Anderson relies on this Court's decision in *Oasis v. Zoning Hearing Board of South Annville Township*, 94 A.3d 457 (Pa. Cmwlth. 2014). There, the South Annville Township Zoning Hearing Board (ZHB) denied a special exception application due to the applicant's failure to adequately identify a proposed method of sewage treatment.[16] During the proceedings before the ZHB, the applicant provided evidence that the property at issue already had an on-lot sewage treatment system. The system, however, would be inadequate if the applicant sought to enlarge the proposed facility. To that end, the applicant presented evidence that the property may be suitable for several elevated sand mounds or, alternatively, an on-site packaged wastewater treatment

---

[16] Although *Oasis* involves the consideration of a special exception application rather than a conditional use application, "the same burdens apply" in both processes. *White Adver. Metro, Inc. v. Zoning Hearing Bd. of Susquehanna Twp.*, 453 A.2d 29, 33 (Pa. Cmwlth. 1982).

28

facility. The ZHB expressed concern that the applicant would not be able to obtain the approval of the Pennsylvania Department of Environmental Protection (DEP) for its proposed sewage treatment systems. After the ZHB's denial of the application, the applicant appealed to the Court of Common Pleas of Lebanon County, which affirmed. On appeal this Court reversed, explaining that the applicant did not need to demonstrate that it would be able to obtain DEP approval. The applicable zoning ordinance required only that an applicant specify a method of sewage disposal. Accordingly, the ZHB's "only concern should have been whether [the applicant] has identified a means of sewage disposal, not whether that method would be approved by DEP." *Oasis*, 94 A.3d at 463. The applicant satisfied the requirement by providing evidence of the system already in place on the property as well as the specific types of systems being considered to accommodate future expansion of the facility.

*Oasis* is distinguishable from the instant matter. There, the applicant clearly identified a specific method of sewage disposal—namely, the existing on-lot system, sand mounds, and an on-site packaged wastewater treatment facility. No such identification was made in the instant matter. Further, although we agree with Anderson and the Board that the particulars of development are generally matters to be considered during the land development process, the Ordinance here requires more than the zoning ordinance in *Oasis.* Regarding this issue, we have explained:

> Ordinarily, many of the types of details required for a special exception by the Ordinance here are addressed further along the permitting and approval process because zoning only regulates the use of land and not the

particulars of development and construction.[17] But where more stringent requirements are part of a township's special exception requirements, it is proper for the ZHB to consider them. Even if an applicant demonstrates that it can comply with the ordinance requirements and promises to do so, the ZHB does not err in denying the application. Simply put, a concept plan is insufficient to warrant the granting of a special exception; rather, to be entitled to receive a special exception, the applicant must come forward with evidence detailing its compliance with the necessary requirements.

*Elizabethtown/Mt. Joy Assocs., L.P. v. Mount Joy Twp. Zoning Hearing Bd.*, 934 A.2d 759, 768 (Pa. Cmwlth. 2007) (citations omitted), *appeal denied*, 953 A.2d 542 (Pa. 2008). Here, Anderson was required by Section 27-1809 of the Ordinance to propose a feasible system of sewage disposal that is capable of functioning without polluting the groundwater. Because Anderson provided insufficient evidence concerning the proposed system of sewage disposal, we conclude that Anderson failed to demonstrate compliance with the requirements of Section 27-1809 of the Ordinance.

### 9. *Area and Bulk Requirements*

DiFrancesco next argues that Anderson has failed to demonstrate compliance with the area and bulk requirements in Section 27-303.9 of the Ordinance. Specifically, DiFrancesco contends that Anderson has failed to prove

---

[17] The zoning ordinance in *Elizabethtown/Mt. Joy Associates, L.P. v. Mount Joy Township Zoning Hearing Board*, 934 A.2d 759 (Pa. Cmwlth. 2007), *appeal denied*, 953 A.2d 542 (Pa. 2008), required applicants to demonstrate compliance with requirements concerning architectural style, signage, traffic and road improvements, and lighting. *Elizabethtown/Mt. Joy Assocs., L.P.*, 934 A.2d at 763.

that the proposed on-lot sewage disposal system will not be located within the perimeter setback of the Property. We agree.

Section 27-303.9(B) of the Ordinance provides that an animal show or training facility must have a minimum perimeter setback of 75 feet. The proposed plan provides a 75-foot setback. Within that setback, however, are a number of marks indicating the locations where Lanchester Soil Consultants performed percolation tests in relation to an on-site sewage disposal system. During the hearing before the Board, Mr. Fritsch testified that "[s]anitary sewer will be -- effluent will be handled along North Guernsey Road. You can see the per[colation] tests information shown on the plan as dots with triangles around them and numbers. That was per[colation] testing done by Lanchester Soil Consultants. Facilities will be in that area." (R.R. at 281a.) When asked whether the sanitary sewer system would be located with the 75-foot setback, Mr. Fritsch responded: "I would suspect, yes, but I'm not positive on that because final design has not been prepared by Lanchester Soils." (*Id.* at 281a-82a.) The evidence presented before the Board is insufficient to demonstrate that the proposed use complies with the requirements of the Ordinance. As noted above, the applicant has the burden to prove compliance with the Ordinance—specifically, that no facilities will be located within 75 feet of the property lines. Although the plan does not show the exact location of the sewage disposal system, it does show that the potential locations for such a system fall within the 75-foot setback. Mr. Fritsch's testimony also failed to demonstrate that the sewage system would not fall within the setback. Like the evidence presented concerning the proposed sewage disposal system, the evidence presented as to the area and bulk requirements of the Ordinance falls short of establishing that no facilities will be

31

located within the setback.  We, therefore, conclude that Anderson has failed to demonstrate compliance with the area and bulk requirements in Section 27-303.9 of the Ordinance.

### *10.Traffic*

DiFrancesco next argues that the proposed use did not comply with the Ordinance's specific performance standard concerning impacts on the road network set forth in Section 27-1815 of the Ordinance.  Section 27-1815.2 of the Ordinance provides:

> The applicant shall submit a traffic impact study . . . demonstrating that, separate and apart from traffic volumes, the construction and configuration of the road network and each portion or segment thereof and each intersection therein shall be so constructed, aligned and controlled that the traffic generated from the proposed use will not damage or injure the roads nor cause or contribute to operating hazards on the public roadways. Relevant in the satisfaction of this criteria are the type and weight of the vehicles constituting the generated traffic.

DiFrancesco contends that because Anderson's expert failed to take into account the proper width of an RV and further failed to recognize the frequency with which events could be held throughout the year, Anderson failed to demonstrate that the traffic generated from the proposed use would not damage the roads or contribute to operating hazards on the roads.  As to the width of an average RV, DiFrancesco takes issue with the following testimony:

> Q.  What is the width of a recreational RV?
>
> A.  They are varying in width.  I would generally expect no great[er] than eight feet.
>
> Q.  Is that wider or narrower -- forgive my ignorance -- than a standard triaxle truck let's say or dump truck?

A. I don't know off the top of my head. I didn't measure
the road for that. I would have to check my book to see
what that is.

(R.R. at 331a.) DiFrancesco suggests that it was inappropriate for Mr. Heinrich to opine that two RVs could pass safely when he did not know the dimensions of an RV. The testimony above, however, indicates that Mr. Heinrich simply did not immediately know how wide an RV was in comparison to a specific type of truck. Mr. Heinrich did testify that an RV is generally no larger than eight feet wide, and agreed that "two RVs, one coming to the site, one leaving the site, could pass each other safely on North Guernsey Road." (*Id.*) As to the testimony concerning the frequency of events, DiFrancesco takes issue with the following testimony:

Q. Do you know what the traffic volume is on weekends on Route 41?

A. No, I do not.

Q. And I guess if you did know that, could you estimate would it impact on level of service particularly when these tournaments are coming, letting out? What would be the affect of level of service at North Guernsey Road?

A. Again we are talking about – I'm assuming you're referring to weekends during events. Again we are talking about it not occurring every weekend, so it's almost like special events, almost like considering -- traffic engineers do not consider traffic impact of a shopping center on Black Friday. First of all, people are not working on Black Friday. Second of all, traffic volumes are elevated. It's almost similar to the situation we are talking here where traffic is elevated for special events. There is a time period when traffic is generally not considered peak traffic at that time. But to specifically answer your question, it was not something that was asked of me to specifically look at. Considering traffic volume I'm familiar with on Guernsey Road, study I have done on Route 41 and other locations, I don't think level of service is going to be an issue.

33

(*Id*. at 334a-35a.) DiFrancesco suggests that this testimony indicates that "Mr. Heinrich conducted his traffic impact study under the incorrect assumption that Anderson's proposed canine sporting competitions would be rare events occurring only a few times over the course of the year." (DiFrancesco Br. at 23.) The testimony above, however, demonstrates only that Mr. Heinrich knew that events would not occur every weekend and that such events were "almost similar" to special events where traffic is elevated. (R.R. at 334a-35a.) In both of these arguments concerning Mr. Heinrich's testimony, DiFrancesco essentially asks us to reevaluate the Board's credibility determinations as to the testimony of expert witnesses and reweigh the evidence, which we cannot do. *Piper Grp., Inc. v. Bedminster Twp. Bd. of Supervisors*, 992 A.2d 224, 240 (Pa. Cmwlth. 2010) ("[T]he Board, as the factfinder is the sole judge of credibility with the power to resolve conflicts in the testimony and to reject even uncontradicted testimony if it should find said testimony lacking in credibility."), *aff'd*, 30 A.3d 1083 (Pa. 2011). Mr. Heinrich presented a traffic impact study, in which he opined that "there will be little traffic impact due to new traffic generated by the proposed development." (R.R. at 782a-83a.) This is sufficient to demonstrate compliance with Section 27-1815 of the Ordinance. Accordingly, we reject DiFrancesco's argument that the proposed use did not comply with the specific performance standard concerning impacts on the road network.

## C. Health, Safety, and Welfare

Appellants next argue that they met their burden to establish that the proposed use would adversely affect the health, safety, and welfare of the community. We have concluded above, however, that Anderson failed to meet his burden to establish by substantial evidence that he has demonstrated compliance

34

with the sections of the Ordinance pertaining to Ground Water Protection, area and bulk requirements, and sewer. As Anderson has failed to satisfy his burden and, thus, his entitlement to the conditional use, the burden did not shift to Appellants to demonstrate that the conditional use threatened the community. *Visionquest Nat'l, Ltd.*, 569 A.2d at 917. Accordingly, we need not address Appellants' arguments as to the health, safety, and welfare of the community.

### III. CONCLUSION

Because Anderson failed to satisfy his burden to prove compliance with the Ordinance, we reverse the trial court's order.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wayne DiFrancesco and
Mary Schlachter

        v.

Board of Supervisors of
the Township of London Grove
and Township of London Grove
and Cliff M. Anderson

Appeal of: Wayne DiFrancesco

Mary Schlachter,
                Appellant

        v.

Board of Supervisors of London
Grove Township,
Cliff M. Anderson, and
Wayne DiFrancesco,
London Grove Township

:      No. 730 C.D. 2015

:      No. 745 C.D. 2015

## **O R D E R**

AND NOW, this 27th day of April, 2016, the order of the Court of Common Pleas of Chester County is hereby REVERSED.

_____
P. KEVIN BROBSON, Judge